IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| THE CREATIVE COMMUNITY HOUSING PROJECT, INC., a Georgia non-profit corporation, | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action File No.: |
| v. | ) ) | _____ |
| VICE MAGAZINE PUBLISHING, INC. and INTEL CORPORATION, | ) ) ) | *TRO Hearing Requested for the week of August 23, 2010[1]* |
| Defendants. | ) | |

## PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION AND FOR AN IMMEDIATE HEARING AND BRIEF IN SUPPORT

THE CREATIVE COMMUNITY HOUSING PROJECT ("Community") file this Motion for a Temporary Restraining Order ("TRO"), Preliminary Injunction ("PI"), and Immediate Hearing to restrain Defendants from further infringement of Community's Marks in Atlanta, New York City and Miami, Florida.

---

[1] Plaintiff's counsel has provided copies of the Complaint and this Motion to counsel for Defendants, as certified in Section V, below. Once notice of a hearing is received by Plaintiff, Plaintiff counsel will forward it to counsel for Defendants.

# TABLE OF CONTENTS

I.     Introduction (p. 3)
       A.   Background (p. 3)
       B.   Community's Marks and Defendants' Blatant Infringement (p. 4)
       C.   Parties' Respective Services (p. 5)
       D.   This is Largely (But Not Entirely) a
            "Reverse Confusion" Trademark Infringement Case (p. 6)

II.    Legal Authority and Argument (p. 8)
       A.   Community Seeks a TRO/PI Three Grounds (p. 8)
       B.   Plaintiff Is Entitled to a TRO/PI on Counts I, II and V (p. 9)
            i.    *Background*
            ii.   *Legal Standard for TRO/PI*
                        a.   Substantial Likelihood of Success on the Merits
                             (1)   Ownership Right in the Marks
                                   (a) – (g) Description of Community's Uses
                             (2)   Inherent Distinctiveness
                             (3)   Likelihood of Confusion
                        b.   Substantial Threat of Irreparable Harm
                        c.   The Balance of the Threatened Injury/Damage
                        d.   Not Adverse to the Public Interest
       C.   Plaintiff Is Entitled to TRO/PI as to Count III (Cybersquatting) (p. 33)
            i.    *Introduction*
            ii.   *Community's Marks are Distinctive*
            iii.  *Defendants' Domain Name is*
                  *Confusingly Similar to Community's Marks*
            iv.   *Defendants Registered or Used the*
                  *Domain Name with a Bad Faith Intent to Profit*
       D.   Plaintiff is Entitled to TRO/PI as to Count IV
            (Charitable Groups) (p.39)

III.   Scope of Injunctions Sought by Community (p. 41)

IV.    Request for Immediate Hearing and Rule 65(b) Certification (p. 42)

V.     Conclusion (p. 43)

# I. <u>Introduction</u>

## A. <u>Background</u>

This is a suit primarily for infringement of unregistered service marks and for cybersquatting. "Section 43(a) of the Lanham Act forbids unfair trade practices involving infringement of trade dress, service marks, or trademarks, *even in the absence of federal trademark registration*." (*Planetary Motion, Inc. v. Techspolosion, Inc.*, 261 F.3d 1188, 1195 (11th Cir. 2001) (emphasis added)). "Common law and statutory trademark infringements are merely specific aspects of unfair competition." (*Planetary Motion*, n. 5).

Importantly, "common law unfair competition protection extends to non-profit organizations because they nonetheless engage in competition with other organizations." (*Planetary Motion*, 1119 (citing *Girls Clubs of Am., Inc. v. Boys, Clubs of Am., Inc.*, 683 F.Supp. 50 (S.D.N.Y.1988) *aff'd*, 859 F.2d 148 (2d Cir.)).

B.    Community's Marks and Defendants' Infringement

Two of Community's marks involved in this action are[2]:

the atlanta
creativesproject

and

the
creativesproject

The short chronology of events is that Community began using the marks at issue in 2007 and 2008.  In 2009, Community had business dealings with Defendant Vice.  In 2010, Defendants adopted the below mark, for a public relations campaign which is directly competitive with Community's:

the
creators project

In addition to the two stylized marks above, Community owns[3] the following marks which are also at issue: (1) THE CREATIVES PROJECT (word

---

[2] The facts herein have been verified by Neda Abghari in a Verification filed with the Complaint.

mark); (2) THECREATIVESPROJECT.COM and THECREATIVESPROJECT.ORG (collectively referred to as "THECREATIVESPROJECT.COM/.ORG" (domain names)[4] and (3) THE ATLANTA CREATIVES PROJECT (word mark). Community's five marks are collectively referred to as "Marks" or "Community's Marks."

In addition to the stylized mark shown above, Defendants' are also using: (1) THE CREATORS PROJECT (word mark) and (2) THECREATORSPROJECT.COM (domain name). All three of Defendants' marks are referred to as "Infringing Marks."

C.    The Parties' Respective Services

The above marks are used by their respective owners for the identical or nearly services; namely, organizing, promoting and hosting live events relating to art and culture; displaying artistic works on-line and in-person; and furnishing

---

[3] All rights to these trademarks were assigned to Community by Neda Abghari. A copy of the Assignment is attached to the Complaint as Exhibit A.

[4] Trademark Manual of Examining Procedure, §1209.03(m), "a mark comprised of an Internet domain name is registrable as a trademark or service mark only if it functions as an identifier of the source of goods or services."

informational services related to art, artists, culture and artist communities to inform and promote artist collaboration.[5]

> D. This is Largely (But Not Entirely) a
> "Reverse Confusion" Trademark Infringement Case

The typical trademark infringement case involves a claim by a trademark owner that a subsequent user of a mark is trying to trade on the goodwill associated with the senior user's mark (*i.e.*, the junior user suggests to the public that its product is affiliated with the senior user). This creates confusion as to the origin of the *junior* user's services.

"Reverse confusion" trademark infringement cases are different:

[R]everse confusion protects 'smaller senior users ...
against larger, more powerful companies who want to use
identical or confusingly similar trademarks." Absent
reverse confusion, "a company with a well established
trade name and with the economic power to advertise

---

[5] The services provided by the Parties under the respective marks are described in greater detail in the Complaint. (Complaint, ¶5 for Community's and ¶¶ 35 through 37 for Defendants).

extensively [would be immunized from suit] for a product name taken from a competitor.

(*A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 228 (3d Cir.2000); *see also*, 4 McCarthy on Trademarks and Unfair Competition § 23:10 (4th ed.) ("reverse confusion occurs when the junior user's advertising and promotion so swamps the senior user's reputation in the market that customers are likely to be confused into thinking that the senior user's goods are those of the junior user: the reverse of traditional confusion") and *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 24 U.S.P.Q.2d 1001, 1010 (7th Cir. 1992), *cert. denied*, 507 U.S. 1042, 123 L. Ed. 2d 497, 113 S. Ct. 1879 (1993) ("[r]everse confusion occurs when a large junior user saturates the market with a trademark similar or identical to that of a smaller senior user. …[O]ther circuits have endorsed the concept. … We therefore hold that reverse confusion is a redressable injury under the Lanham Act.")). Reverse confusion has been recognized and adopted by the Fifth Circuit in *Capital Films Corporation v. Charles Fries Productions, Inc.*, 628 F.2d 387, 208 U.S.P.Q. 249 (5th Cir.1980)).[6]

---

[6] Fifth Circuit precedent pre-dating 1981, is binding on the Eleventh Circuit. (*Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc)).

The Complaint also asserts claims for Defendants' violations of Anticybersquatting Consumer Protection Act (15 U.S.C. § 1125(d)), as Defendants are using the thecreatorsproject.com domain name, which is confusingly similar to Community's Marks. Finally, the Complaint seeks the protection of Georgia law which specifically guards against infringement of the trademarks of charitable organizations, of which Community is one. (O.C.G.A. § 10-1-470 *et seq.*).

## II.     Legal Authority and Argument

### A.     Community Seeks a TRO and a PI On Three Grounds

Community seeks a TRO and a PI on three separate grounds. First, an injunction with respect to its unfair competition based on the Lanham Act and Georgia common law. (Complaint, Counts I, II and V). Second, an injunction based on Defendants' violations of the Anticybersquatting Act, to enjoin Defendants from further using the domain name, thecreatorsproject.com. (Complaint, Count III (¶¶63-66)). Third, under O.C.G.A. § 10-1-471, which provides for injunctions against infringement of marks belonging to charitable organizations. (Complaint, Count IV (¶¶67-74)).

B.    Plaintiff Is Entitled to a TRO and a PI as to Counts I, II and V
      for Unfair Competition and Trademark Infringement

    i.    *Background*

One fundamental objective of trademark law is to prevent another from copying a source-identifying mark.  (*Qualitex Co. v. Jacobson Prods., Co., Inc.*, 514 U.S. 159, 163-64 (1995)).   In trademark infringement cases, "complete injunctions against the infringing party are the order of the day."  (*Flight of Georgia, Inc. v. Angel Flight America, Inc.*, 522 F.3d 1200, 1209, 86 U.S.P.Q.2d 1422, 1428 (11th Cir. 2008) ("the public deserves not to be led astray by the use of inevitably confusing marks")).

    ii.    *Legal Standard for TRO/PI*

A court may issue a TRO/PI in a trademark infringement action when the plaintiff establishes four elements:

> (1) substantial likelihood of success on the merits; (2) that it would be irreparably harmed if injunctive relief were denied; (3) that the threatened injury to the trademark owner outweighs whatever damage the injunction may cause to the alleged infringer; [and] (4) that the injunction, if issued, would not be adverse to the public interest.

(*Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1300 (11th Cir. 2001)).  The same standard applies to a request for a TRO as for a PI.  (*Ingram v. Ault*, 50 F.3d 898, 900 (11th Cir.1995)).   Under the likelihood of success on the merits

inquiry, Eleventh Circuit holds that the word "substantial" does not add to the "quantum of proof" required, rather the appropriate standard is if it is "probable" or "likely" that the movant will succeed on the merits. (*Shatel Corp. v. Mao Ta Lumber & Yacht Corp.*, 697 F.2d 1352, n. 2 (11th Cir.1983)).

### a.     *Substantial Likelihood of Success on the Merits*

The first prong of the test for a TRO/PI is "substantial likelihood of success on the merits." To establish a claim of infringement of an unregistered mark under the Lanham Act, the owner must show that (a) it has an ownership right in the mark and that (b) there is a likelihood that consumers will confuse the defendant's mark with the plaintiff's. (*See Montgomery v. Noga*, 168 F.3d 1282, 1300 (11th Cir. 1999)).

### (1)     Community's Ownership Right in the Marks

Under common law, trademark ownership rights are "appropriated only through actual prior use in commerce." (*Tally-Ho, Inc. v. Coast Community College Dist.*, 889 F.2d 1018, 1022 (11th Cir.1989)). To warrant protection, use of a mark "need not have gained wide public recognition," but "[s]ecret, undisclosed internal shipments are generally inadequate." (*Planetary Motion*, (citing *Blue Bell, Inc. v. Farah Mfg. Co.*, 508 F.2d 1260, 1265 (5th Cir.1975)).

"As long as there is a genuine use of the mark in commerce . . . ownership may be established even if the first uses are not extensive and do not result in deep market penetration or widespread recognition." (*Bronstein v. Bronstein*, 2007 WL 646965, *13 (S.D.Fla.2007) (quoting *Allard Enterprises, Inc. v. Advanced Programming Resources*, 146 F.3d 350, 358 (6th Cir.1998)). Ownership rights can be acquired by use of a mark on the Internet. (*Bronstein v. Bronstein*, 2007 WL 646965, *13 (S.D.Fla.2007) (plaintiff's "catalog and internet marketing was creating an association between the trade name and the product. Use of the [] mark, on the internet and supported by direct telemarketing by [plaintiff], while not extensive [,] is probable to be found as sufficient to vest ownership and protectible rights in the mark.")).

The following portion of this Brief describes how Community adopted and publicly uses its marks.

(a)     *Since 2007, Community Has Used*
        *its Marks in Domain Names and Web Content*

In 2007 and 2008, Community registered and used these domain names:

| 1 | Theatlantacreatives.org | Registered by Ms. Abghari on October 12, 2008. |
|---|---|---|
|   |   |   |
| 2 | Theatlantacreatives.com | Registered by Ms. Abghari on October 12, 2008. |
|   |   |   |
| 3 | Atlantacreatives.org | Registered by Ms. Abghari on August 29, 2007. |
|   |   |   |
| 4 | Atlantacreatives.com | Registered by Ms. Abghari on September 23, 2007. |
|   |   |   |
| 5 | Thecreativesproject.com | Registered by Ms. Abghari d/b/a The Creatives Project on October 12, |

| | | 2008. |
|---|---|---|
| | | |
| 6 | Thecreativesproject.org | Registered by Ms. Abghari d/b/a The Creatives Project on October 12, 2008. |
| | | |
| 7 | Thecreativesproject.blogspot.com | thecreativesproject.blogspot.com; posted content here from January 31, 2009 to January 12, 2010. |

Community has used The CREATIVES PROJECT word marks continuously on a website at one or more of the above domain names since as early as October 2007. Community first used The CREATIVES PROJECT stylized marks on one or more of the above domain names in February 11, 2008 and has used one or more of these marks continuously since January 18, 2010. (Exhibit A). Samples of Community's website content at the above domain names are shown in Exhibit A hereto.

The content on Community's websites was intended for national consumption, although Community initially focused its services in Atlanta, New York City and Miami, Florida. In fact, following a live event hosted by Community in Atlanta in November, 2009 -- which 600 people attended -- Ms. Abghari began planning Community's next event, which was to be in New York City during the Summer of 2010. Community used its websites to market itself to its target audience, including a "CALL TO ARTISTS" for an event to take place there. (Exhibit B). Community similarly marketed its services to artists in Miami. (Exhibit C).

Posting the Marks and content relating to its services on websites at the above domain names, gave Community trademark rights in the Marks. (*See Planned Parenthood Federation of America, Inc. v. Bucci*, 42 USPQ2d 1430 (S.D.N.Y. 1997), *aff'd,* 152 F.3d 920 (2d Cir. 1998), *cert. denied*, 525 U.S. 834 (1998) (offering services *via* the Internet constitutes use in commerce, since the services are available to a national and international audience who must use interstate telephone lines to access a website)).

> *(b)     Since 2008, Community Has Used its*
> *Marks During Live Events and Photo Shoots*

In addition to hosting content on websites at the above domain names, Community used its Marks during live events and photo shoots as early as 2008.

*Uses in Atlanta, Georgia.*   Under the THE ATLANTA CREATIVES PROJECT word and stylized marks, Community hosted a launch event in Atlanta, Georgia on November 6, 2009.  Puma, the sporting apparel company, sponsored this event.  It was held at the Studio Plex and was attended by approximately 600 people.  In addition to this event, from 2007 through 2010, as part of the services it provides, Community held approximately 45 photo shoots of artists in Atlanta.

*Uses in New York City.*  Under the THE CREATIVES PROJECT Marks, as early as September and October 2007, Community engaged in four photo shoots in

New York City. In June 2009, Community engaged in six more photo shoots, again under THE CREATIVES PROJECT word and stylized marks. In preparation for a live event Community was planning to hold in New York City during the Summer of 2010, Community engaged in five more photo shoots in March 2010.

As an aside, Community was compelled to cancel the event it was planning for New York City when, in May 2010, Defendants publicly announced their competing venture, "The Creators Project." At that time, Defendants also announced that *its* first live event would take place in New York City on June 26, 2010. This was a direct conflict with the event Community was planning for the same time period and in the same city and under nearly identical marks.

*Uses in Miami.* In November 2008, Community marketed itself, under the THE CREATIVES PROJECT word and stylized marks, to artists in Miami. For example, Community stated on its website that, "the atlanta creatives project has been invited to Art Basel in Miami to kick off THE CREATIVES PROJECT with a series of portraits to be taken at the fair DEC4-7th" and, after the event, posted a "thank you." (Exhibit C). And further, under its Marks, Community engaged in ten photo shoots in Miami, Florida on December 5 and 6, 2008. Since Defendants' infringement has come to light, Community has focused more of its marketing

activities toward Miami, due to Defendants' stampeding Community's rights in New York City. (Exhibit H).

(c)    *Since 2009, Community Has Used Marks on the Social Media Website, FaceBook*

At least as early as May 25, 2009, Community began to use the THE ATLANTA CREATIVES PROJECT word mark on the popular social media website, FaceBook. (Exhibit D). Community's FaceBook page also contains links to thecreativesproject.com/.org website, which, as of January 18, 2010, contained the THE CREATIVES PROJECT stylized mark. As of August 13, 2010, this FaceBook page is "liked" (a/k/a "followed") by 1,282 FaceBook users.

At least as early as February 19, 2010, Community began to use the THE CREATIVES PROJECT word mark on a FaceBook page titled, "The Creatives Project." (Exhibit E). Community's FaceBook page also contains links to thecreativesproject.com/.org website, which contained the THE CREATIVES PROJECT stylized mark as of January 18, 2010. As of August 13, 2010, this FaceBook page has "370 members" (*i.e.*, FaceBook users). (Exhibit F).

Also on FaceBook, in January and February 2010, Community posted a "call to artists" as a "Public Event." (Exhibit G). The post announced, "CALL TO ARTISTS *currently living in NYC*. The Creatives Project: New York 2010."

(Exhibit G (emphasis added)). As many as 10,000 FaceBook users viewed it. A sample email response to Community's "Call to Artists" is included in Exhibit G.

*(d)    Since July 2009, Community Has Used
its Marks on the Micro-Blog Website, Twitter*

At least as early as July 9, 2009, Community began to use the THE CREATIVES PROJECT word mark on the micro-blog website, Twitter. (Exhibit H). Community's Twitter page also contains numerous links to thecreativesproject.com/.org website, which contains the THE CREATIVES PROJECT stylized mark, as of January 18, 2010. As of August 13, 2010, Community has 162 Twitter followers. (Exhibit H).

Many of Community's posts on Twitter are directed at artists in the Atlanta area. (Exhibit H). Other posts, dating back to January 2010, are directed at artist in NYC. For example,

```
Come to "CALL TO ARTISTS & DJ's" Today
at 5:05 pm until <br />Monday, March
15 at 8:05 pm. *select attending if
you... http://bit.ly/dqm7as 10:09 PM
Feb 9th via FaceBook.

HAPPY NEW YEAR GUYS!!! we are excited
to announce that we will be back in
NYC FEB 20- MARCH 20 shooting artist
and...          http://bit.ly/5gR5Yq
Thursday, January 07, 2010 4:25:32 PM
via Facebook
```

```
is    excited    about    THE    CREATIVES
PROJECT.. join the group!!!! it is the
natl'    version    of    the    atlanta
creatives...        http://bit.ly/csEArx
Monday, April 26, 2010 11:32:04 PM via
FaceBook.
```

> (e)    *Since 2008, Community Has Used its Marks*
> *on the Social Media Website, MySpace*

At least as early as October 1, 2008, Community began to use the THE ATLANTA CREATIVES PROJECT word mark on the social media website, MySpace. (Exhibit I). And at least as early as September 23, 2009, Community was using the THE CREATIVES PROJECT word mark on MySpace. Community's MySpace page also contains links to thecreativesproject.com/.org website, which contains the THE CREATIVES PROJECT stylized mark, since January 18, 2010. As of August 13, 2010, Community's MySpace page has 874 "friends." (Exhibit I). Community's posts also were republished on the Internet at Feedburner.com. (Exhibit I).

> (f)    *Community Was Featured in the Media*

On March 18, 2009, Ms. Abghari and The Atlanta Creatives Project was featured in a news story on burnaway.org, a publisher of "Art Reviews & Commentary." In the article, the The Atlanta Creatives Project is aptly referred to as "a photographic documentation of Atlanta's creative core." (Exhibit J). The

story goes on to accurately report that, "the project has been well received and, due to demand, is now expanding to include other cities, such as Miami. Although these cities will be part of "The Creatives Project," Abghari will always focus more on Atlanta." (*Id*.).

Also, numerous business records show use of the Community Marks in Atlanta and on the Internet in 2008, long before Defendants' adopted the Infringing Marks in May 2010. (Exhibit K).

Community respectfully submits that all of these facts are sufficient to show that (1) Community adopted the Marks and (2) used them in a way sufficiently public to identify its services among artists in Atlanta, New York, Miami and elsewhere. (*Planetary Motion, Inc. v. Techspolosion, Inc.*, 261 F.3d 1188, 1195 (11th Cir. 2001)).

(g)    *Community's "Natural Zone of Expansion"*

Community respectfully submits that its uses of the Marks, as described above, are sufficient to establish that Community acquired rights to the Marks in at least Atlanta, New York and Miami. Even if the Court were to determine that Community's actual use of the Marks in New York City or Miami are lacking, Community's trademark rights are broadened by the doctrine of natural zone of expansion.

A senior user who cannot prove use in particular area, can still prevail over a junior user by establishing that the area was within the senior user's "zone of its probable or natural expansion." (*Tally-Ho, Inc. v. Coast Community College Dist.*, 889 F.2d 1018 (11th Cir.1989)). In other words, the "zone of natural expansion" provides the senior user with some limited "breathing space" in which to expand beyond its current use. (*Tally-Ho, Inc.*, 889 F.2d at 1027-28).

Community concedes that the zone of natural expansion doctrine is "narrowly defined." (*Tally-Ho*, 889 F.2d at 1028). But in this case, the evidence of Community's probable (if not actual) expansion into New York City and Miami is strong. One example is Community's FaceBook post which stated, "CALL TO ARTISTS *currently living in NYC*." (Exhibit G (emphasis added)). Another example, is Community's December 4, 2008 post on its website at thecreatorsproject.org, which announced, "EXPANSION. The atlanta creatives project has been invited to Art Basel in Miami to kick off THE CREATIVES PROJECT . . ." (Exhibit C). The Burnaway.org article also memorialized and announced Community expansion into cities outside Atlanta. (Exhibit J). These posts and announcements are in addition to the actual activities Community undertook in New York City and Miami under its Marks, as discussed in Subsections (a) through (f).

It also should be noted that Defendants saturated New York City with the Infringing Marks, in preparation for its June 2010 launch event. So, the Defendants' infringement is the reason Community, never hosted the event it was planning in New York City. To the extent Defendants argue that Community failed to penetrate New York City or Miami, that was due to Defendants' infringement and Defendant should not gain from its own wrongful conduct.

Community believes that its actual use of its Marks in connection with New York City and Miami are sufficient to give it trademark rights there. But, if the Court finds otherwise, Community respectfully submits that the Court should find that New York City and Miami were in Community's "zone of natural expansion."

### (2)    Inherent Distinctiveness of Community's Marks

In order to have "ownership rights in a mark," the marks must be distinctive. "There are four types of marks – generic, descriptive, suggestive, and arbitrary." (*Freeway Ford, Inc. v. Freeway Motors, Inc., et al.*, 512 F. Supp.2d 1353, 1360 (M.D. Ga.2007) (citing *Univ. of Ga. Athletic Ass'n v. Laite*, 756 F.2d 1535, 1540 (11th Cir. 1985)). Suggestive and arbitrary marks are inherently distinctive; whereas, descriptive marks require proof of secondary meaning and generic marks

are not protectable at all.  (*See id.* at 1360-61 (citing *Laite*, 756 F.2d at 1540)).  "A suggestive mark 'subtly connotes something about the service or product.'" [7]  (*Id.*)

As part of its requirement of showing that it has ownership of the Marks, Community respectfully submits that the Marks are suggestive.  The word "creative" is most commonly an *adjective*, as in "marked by the ability or power to create."  (www.merriam-webster.com/dictionary/creative  08/05/2010).  But "creative" is also a *noun*, which can mean "creative activity or the material produced by it especially in advertising."  (www.merriam-webster.com/dictionary/creatives 08/05/2010).  And "creative" is rarely pluralized. Thus, the uncommon word "creatives" has varying uses and meanings and can be interpreted in several ways.

Likewise, PROJECT is both a noun and a verb.  As a noun, PROJECT has various meanings, including, (1) "a specific plan or design;" (2) "a housing development consisting of houses or apartments built and arranged according to a single plan," (3) "a planned undertaking;" (4) "a definitely formulated piece of

_____

[7] "A 'descriptive mark' identifies a characteristic or quality of a product or service, such as its intended use, ingredients, dimensions, or desirable features."  (*Atlanta Allergy and Asthma Clinic, P.A. v. Allergy & Asthma of Atlanta, LLC*, 685 F.Supp.2d 1360 (N.D.Ga. 2010).

research;" and (5) "a task or problem engaged in usually by a group of students to supplement and apply classroom studies." (www.merriam-webster.com/dictionary/project 08/05/2010). PROJECT is also a *verb*, and has numerous meanings, among other things, (1) "to devise in the mind," (2) "to throw or cast forward;" (3) "to cause to jut out;" (4) "to display outwardly especially to an audience;" and (5) "to attribute to other people or to objects." (www.merriam-webster.com/dictionary/project 08/05/2010).

Because of the varying uses and meanings of the words "creatives" and "project," the Mark THE CREATIVES PROJECT, does nothing more than "subtly connote[] something about the service or product.'" (*Freeway Ford, Inc. v. Freeway Motors, Inc., et al.*, 512 F. Supp.2d 1353, 1360 (M.D. Ga.2007)). A consumer would not immediately connect THE CREATIVES PROJECT with the accompanying services, as described in Note 5, above. A consumer could take the mark to mean a number of things, especially, that the owner is offering goods (*e.g.*, an undertaking or task involving or requiring creativity).

Community respectfully submits that its Marks are suggestive only and therefore inherently distinctive. (*Freeway Ford, Inc. v. Freeway Motors, Inc., et al.*, 512 F. Supp.2d 1353, 1360-61; see also, McCarthy § 11:67 ("[i]f the mental

leap between the word and the product's attributes is not almost instantaneous, this strongly indicates suggestiveness, not direct descriptiveness.")).

Since Community has adopted the Marks and they are distinctive, Community submits that it has established that it is the owner of the Marks.

### (3) Likelihood of Confusion

Next in the "likely to succeed on the merits" analysis, Community must show likelihood of confusion between its Marks and those adopted by Defendants. Seven factors are used to determine whether there is a likelihood of confusion:

> (1) the strength of the infringed mark; (2) similarity of the marks; (3) similarity between services; (4) similarity of sales methods; (5) similarity of advertising; (6) Defendant's intent; and (7) actual confusion.

(cite *Id.* at 1362).

*Strength of mark.* When applying the strength of mark factor in a reverse confusion case, "the lack of commercial strength of the smaller senior user's mark is to be given less weight in the analysis because it is the strength of the larger, junior user's mark which results in reverse confusion." (*Commerce Nat'l Ins. Servs.*, 214 F.3d at 444).

Community's Marks are strong because they are suggestive and because they have been used continuously in Atlanta, New York City and Miami, as we ll as nationally and internationally *via* the Internet for years. Since the Community's

Marks are used on-line, they may be accessed by anyone in the world with an Internet connection.

Additionally, until Defendants' actions, no one else used the same or similar marks as Community. Furthermore, in November 2009, Community hosted a launch party event in Atlanta which was attended by approximately 600 people. Moreover, Community's "call to artists" on FaceBook was viewed by more than 10,000 people. Therefore, Community's Marks have garnered recognition among its target audiences; namely, artists in Atlanta, New York City and Miami.

*Similarity of marks.* The Parties' respective word marks are nearly identical. Both are three words and start with "THE" and end with "PROJECT." With respect to the middle words, each uses the prefix CREAT and end with the letter S. Thus, they word marks look and sound nearly identical. Moreover, based on the viewer's interpretation, the words "creatives" and "creators" can have similar meanings.

As shown on Page 4, above, the Parties' respective stylized marks are also very similar:

• both employ a dark color for the first word and a lighter color for the second word;

• both use lower case letters only;

• both use sans-serif typefaces;

• both significantly shrink the word "THE;"

• both place the "THE" above the front of the first word; and

• the letters and words in each stylized mark are roughly the same proportions to each other.

Considering that the respective marks combine nearly identical *words* with extremely similar *stylization*, this factor weighs heavily in favor of Community.

*Similarity of Services*.   The Parties' service offerings are nearly identical; namely, organizing, promoting and hosting live events relating to art and culture; displaying artistic works on-line and in-person; and furnishing informational services related to art, artists, culture and artist communities to inform and promote artist collaboration.  (See also, Note 5, above).

Therefore, this factor weighs heavily in favor of Community.

*Similarity of Advertising*.   The next element is the similarity of sales methods and advertising.  First, Community does not sell goods under its Marks nor does it believe Defendants do.  However, Community and Defendants are trying to reach the identical segment of the population (namely, artists) and that segment is perhaps most reachable on the Internet.

Community and Defendants both primarily rely on their own websites (at thecreativesproject.com for Community and at thecreatorsproject.com for Defendants) and the social media websites, FaceBook[8], MySpace[9] and Twitter[10]. Further, searches on Google for "The Creatives Project" (in quotes and without quotes) return sponsored (*i.e.*, paid for) ads to thecreatorsproject.com. (Exhibit O). In other words, Defendants are paying Google to post an ad for its "The Creators

---

[8] Defendants' first post on their The Creators Project FaceBook page was on May 17, 2010 and stated, "Welcome to year one of The Creators Project, a celebration of technology and the arts via VICE and @Intel. Stay Tuned!" As of August 18, 2010, 18,841 people "like" The Creators Project's FaceBook page. The first and last page of The Creators Project's FaceBook page are attached hereto as Exhibit N.

[9] The Creators Project is also promoted on MySpace. (Exhibit N).

[10] Defendants' first post on their The Creators Project Twitter page was on May 17, 2010 and made the same announcement as in Note 8, above. From May until August 18, 2010, Defendants published at least 649 posts on The Creators Project's Twitter page and have page 4,469 followers. The first and last page of The Creators Project's Twitter page are attached hereto as Exhibit N.

Project" when a Google-user searches for Community's "The Creatives Project." (Exhibit O).

Since Community and Defendants are both using the identical channels to promote their services, this factor favor weights heavily in favor of a likelihood of confusion.

*Defendants' Intent.* In 2009, Neda Abghari, in furtherance of the work for The Creatives Project, took photographs of members of two bands (Blacklips and Cartel) who are signed to Defendant Vice's record label. She worked with both bands' managers who were Vice representatives. Such work made them aware of Community itself and of Community's Marks. Moreover, even today, Defendants are paying Google to post an ad for their venture when a Google-user searches by name for Community's venture. (Exhibit O).

Community respectfully submits that given the above and given the strikingly similarities in both the *word* marks and the *stylized* marks, there is sufficient evidence of bad intent to have this factor weigh in Community's favor.

*Actual Confusion.* The final of the seven "likelihood of confusion" factors is evidence of actual confusion. Ms. Abghari has received expressions of surprise and "happiness" that Defendant Intel joined as a sponsor. Ms. Abghari's summarizes two of them as:

*dinner with aurelie* █████ *june 25th:* says that when she first saw the links on facebook and the web she thought it was for the creatives project and thought "wow neda's project is doing awesome" when she realized it was not the creatives project she felt bad and guilty that she was attending the event.

*phone call with j* █████ *june 23rd:* says i was really strange when he received and invite to the creators project event... it was very close to the dates i had originally mentioned and was confused why they would use the same name for this campaign.

Having announced its venture three months ago -- on May 17, 2010 -- Community respectfully submits that there has been an insufficient amount of time during which the respective marks have been used to expect more instances of actual confusion. Community submits that confusion should be inferred from these instances of actual confusion, along with the six other factors, all of which favor Community.

Community adds that evidence of actual confusion "is difficult to find. . . because many instances are unreported." (*Checkpoint Systems, Inc. v. Check Point Software Technologies, Inc.,* 269 F.3d 270, 291 (3rd Cir. 2001)). Furthermore, even at the preliminary injunction stage, proof of actual confusion, while strong, is not essential. (*E. Remy Martin & Co. v. Shaw-Ross Intern. Imports, Inc.*, 756 F.2d 1525, 1530-31 (11th Cir. 1985)).

In conclusion of the likelihood of confusion analysis, Community respectfully submits all seven of the factors weigh in Community's favor. Thus,

Community respectfully submits that it has met its burden of showing that there is a substantial likelihood of success on the merits of its claims for unfair competition and common law trademark infringement.

b.    *Substantial Threat of Irreparable Harm*

The second prong of the four part test for a TRO/PI, is substantial threat of irreparable harm.  (*Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018, 1029 (11th Cir.1989) ("'[i]t is generally recognized in trademark infringement cases that (1) there is not [an] adequate remedy at law to redress infringement and (2) infringement by its nature causes irreparable harm.")).  In *North American Medical Corporation v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1228 (11th Cir.2008), the Eleventh Circuit acknowledged that its "prior cases do extend a presumption of irreparable harm once a plaintiff establishes a likelihood of success on the merits of a trademark infringement claim."  (*Id*. at 1227).  A plaintiff is not required to show actual damage or harm, but that there could be loss of reputation, trade, goodwill, or possibility of confusion.  (*Freeway Ford, Inc.*, 512 F. Supp.2d at 1635).  Loss of control of reputation, alone, can be enough to cause irreparable harm.  (*Id.)*

*But there is more behind the urgency of Community's request for immediate relief*.  The actual and likely confusion between Community and Defendants is especially threatening because Defendant Vice's website (viceland.com)

emphasizes vulgar and crude content. For example, a search of Defendant Vice's website for the FCC's notorious "seven dirty words" returned the following results:

1. sh*t          12,000 results on Viceland.com;
2. pi*s          6,100 results on Viceland.com;
3. cu*t          3,790 results on Viceland.com;
4. co*k          1,470 results on Viceland.com;
5. co**sucker    167 results on Viceland.com;
6. motherf*****  391 results on Viceland.com; and
7. ti*s          2,740 results on Viceland.com.

The images accompanying these searches -- a small sample of which are attached hereto as Exhibit L -- are vulgar. (Exhibit L). Since one of Community's long-term objectives is operate outreach programs to introduce art to youths, the content on Vice's website is intolerable to Community, given that the public is confused as to an affiliation between Community and Defendants. This is exacerbated by the fact that Community and Defendants are vying for the attention of the same segment of the population (namely, young artists).

Community will continue to suffer irreparable injury and harm to its Marks by the false association between it and Defendants and their copy-cat venture.

    c.    *The Balance of the Threatened Injury to Plaintiffs and the Damage to Defendants and Public Interest Weighs in Favor of Plaintiffs*

Community has been harmed by the trademark infringement. For example, it cancelled its New York launch event (planned for June 2010), once Defendants

launched their project on May 16, 2010, because of the prominent media attention Defendants were able to acquire for their venture.

With their enormous public relations abilities and tens of millions of marketing dollars, if not enjoined, Defendants will continue creating "reverse confusion," drowning out Community and the good work it seeks to do for artists and the public.

Defendants have promotional events planned for (1) August 14, 2010 in Sao Paulo, Brazil, (2) August 28 in Seoul, Korea, and (3) a three-day finale on September 17 in Beijing, China. While Community appreciates that the Court may not have jurisdiction to enjoin Defendants from using the Marks abroad, this Court can enjoin Defendants from using these events to further its massive-PR campaign in the United States and, more specifically, in Atlanta, New York City and Miami. If Defendants are able to continue its PR campaign under the Infringing Marks – particularly in connection with these three events – they will garner further media attention, which will only further harm Community.

On the other hand, Defendants can refrain from marketing its venture in Atlanta, New York City and Miami. Alternatively, Defendants can use their enormous resources to rename their project. At the same time, Community lacks

the resources to widely publicize any differentiation between its services and those offered by Defendants under the Infringing Marks.

Even further, Community's understanding is that Defendants' venture is for the purpose of marketing themselves and the goods and other services they *sell*; in other words, Defendants' The Creators Project is not itself a business or service-for-hire offering. On the other hand, Community's undertaking is its one and only -- and not for profit -- service offering.

Considering all these factors, Community respectfully submits that balancing the threatened injury to Community and the harm to Defendants, public interest weighs in favor of issuing a TRO and PI.

<blockquote>

d.    *Neither the TRO nor the Preliminary Injunction Would Be Adverse to the Public Interest*
</blockquote>

The requested injunctions would not be adverse to the public interest. First, this case does not involve life, death, health or even happiness. Thus, Community respectfully submits that no *significant* public interest can be impacted by the requested injunctions.

With that said, the public has no interest or need in Defendants' continued use of the Infringing Marks. No one – other than Defendants – gain if the infringement is permitted to continue. In fact, the public will benefit from removal of a confusing mark from the marketplace.

More broadly, the requested injunctions would vindicate the rights of intellectual property owners. Most importantly, the requested injunctions would reinforce the weight and sufficiency of the laws our great country has developed to nurture, protect and encourage creativity, innovation and industriousness.

**C.** **Plaintiff Is Entitled to a Temporary Restraining Order and a Preliminary Injunction as to Count III for Cybersquatting**

*i.* *Introduction*

In addition to a TRO/PI that may issue as a result of Defendants' unfair competition and trademark infringement, Community respectfully submits that it is entitled to an injunction under the Anticybersquatting Act (15 U.S.C. § 1125(d)).

The Anticybersquatting Act was enacted in 1999 to deter registration and use of a domain name which is confusingly similar to a trademark. In any civil action involving the registration or use of a domain name under the Anticybersaquatting Act, a court may order the forfeiture, cancellation or the transfer of the domain name to the owner of the mark. (15 U.S.C.A. § 1125(d)(1)(C)).

To prevail under the Anticybersquatting Act, a plaintiff must prove that (1) its mark is distinctive and entitled to protection, (2) the defendant's domain name is identical or confusingly similar to the plaintiff's mark and (3) the defendant

registered or used the domain name with a bad faith intent to profit. (*Bavaro Palace, S.A. v. Vacation Tours, Inc.*, 203 Fed.Appx. 252, 256 (11th Cir.2006)).

In determining whether there is confusing similarity under the Anticybersquatting Act, courts are to compare the plaintiff's *mark* with defendant's *domain name*. (*Victoria's Cyber Secret Ltd. v. V Secret Catalogue, Inc.*, 161 F.Supp.2d 1339, 1345 (S.D.Fla.2001); see also, *N. Light Tech., Inc. v. N. Lights Club*, 236 F.3d 57, 66 n. 14 (1st Cir.2001) (the identical or confusingly similar requirement of the ACPA looks to the facial similarity of the domain name with the mark). "The inquiry under the ACPA is thus narrower than the traditional multifactor likelihood of confusion test for trademark infringement." (*Coca-Cola Co. v. Purdy*, 382 F.3d 774, 783 (8th Cir. 2004) and *Southern Co. v. Dauben, Inc.*, 324 Fed.Appx. 309, 319 (5th Cir.2009)).

A court should not look beyond the domain name to consider the content of the website. (*Purdy v. Burlington Northern Santa Fe Corp.*, 382 F.3d at 783 (8th Cir.2001)). Consequently, even if it might be evident from the content of the website that it is not sponsored by or affiliated with the plaintiff, there may nonetheless be a violation of the Anticybersquatting Act. (*Id.*); see also *People for Ethical Treatment of Animals v. Doughney*, 263 F.3d 359 (4th Cir.2001) (holding that domain name www.peta.org violated the ACPA because it was identical to the

mark of the plaintiff, People for the Ethical Treatment of Animals, even though a visit to the site itself revealed that it was a parody and that the initials "peta" stood for People Eating Tasty Animals)).

On the other hand, if the name of the website at issue itself makes clear that it is not affiliated with the plaintiff's mark, there can be no likelihood of confusion. (See, e.g., *The Taubman Co. v. Webfeats*, 319 F.3d 770, 777 (6th Cir.2003) (no likelihood of confusion as to TAUBMAN mark where defendant operated website with domain name www.taubmansucks.com)).

### ii. *Community's Marks are Distinctive*

The first element for Community to prove is the distinctiveness and protectability of its Marks. Community's Marks are distinctive in that they are, at most, suggestive of the services Community supplies, as discussed in Section II(B)(ii)(a)(2), above. That Section is incorporated herein.

### iii. *Defendants' Domain Name is Confusingly Similar to Community's Marks*

Defendants' domain name -- thecreatorsproject.com -- is confusingly similar to Community's THE CREATIVES PROJECT and THE CREATIVES PROJECT.COM/.ORG word marks. This was discussed in detail in Section II(B)(ii)(a)(3), above, which is incorporated herein to the extent it discusses Community's word marks and domain name marks.

      *iv.    Defendant Vice Registered the*
              *Domain Name with a Bad Faith Intent to Profit*

With respect to plaintiff's third element under the Anticybersquatting Act, to assist courts in the determination of bad faith intent under the statute, Congress enumerated a non-exclusive list of nine factors to be considered: (1) the trademark or other intellectual property rights of the person, if any, in the domain name; (2) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person; (3) the person's prior use, if any, of the domain name in connection with the *bona fide* offering of any goods or services; (4) the person's *bona fide* noncommercial or fair use of the mark in a site accessible under the domain name; (5) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site; (6) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct; (7) the person's provision of material and misleading false contact information when

applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct; (8) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and (9) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c). (15 U.S.C. § 1125(d)(1)(B)(i)).

Community respectfully submits that, on balance, the above factors favor a finding that Defendant Vice acted with bad faith intent to profit from the thecreatorsproject.com domain name.

With respect to Factor #5, Ms. Abghari's WHOIS search revealed that Defendant Vice -- not Intel -- registered the domain name thecreatorsproject.com on April 1, 2010. (Exhibit M). This is significant because it was two of *Vice's* employees who, in 2009, had first-hand dealings with Community and awareness of Community's Marks. Also, in the January and February, 2010, a few months before Vice registered the thecreatorsproject.com domain name, Community

posted "Calls to Artists currently living in NYC" and the post was viewed by at least 10,000 FaceBook users. (Exhibit G). Perhaps not coincidentally, Vice is located in Brooklyn, New York, which is one of the five boroughs of New York City.

Given the similarities in the Parties' services, and the near identicalness of their word and stylized marks, it is close to impossible to fathom that Vice did not register thecreatorsproject.com with Community in mind and with the intent to benefit from the market penetration Community had achieved at that time. And further, while this is primarily a "reverse confusion" case, there is *indicia* of the traditional, forward confusion. For example, even today, Defendants are paying Google to post an ad for "The Creators Project" when a Google-user searches for "The Creatives Project." (Exhibit O).

Furthermore, with respect to Factors #1 and #3, prior to registering thecreatorsproject.com, neither Defendant used THE CREATORS PROJECT as a trademark. With respect to Factor #2, thecreatorsproject.com does not consist of the legal name of any person. With respect to Factor #4, Defendants' have made no "noncommercial or fair use" of the domain name. Defendants are using thecreatorsproject.com to further Intel's commercial speech and marketing activities.

With respect to Factor #9, as previously discussed, Community's Marks are suggestive and therefore inherently distinctive. Community has no evidence probative of Factors #6, #7 or #8.

In sum, Community respectfully submits that it has demonstrated a likelihood of succeeding on Count III of its Complaint for cybersquatting. Thus, as part of the TRO and PI, Community requests that the Court order Defendants to immediately transfer the thecreatorsproject.com domain name to Community.

### D. Plaintiff Is Entitled to a TRO and a PI as to Count IV for Infringing the Mark of a Charitable Organization

O.C.G.A. § 10-1-470 *et seq.* specifically protects the trademarks of charitable organizations. (See *Most Worshipful Prince Hall Grand Lodge v. Supreme Grand Lodge*, 105 F.Supp 315 (M.D.Ga.1951), *aff'd* at 209 F.2d 156, 157, 100 U.S.P.Q. 135, 135 (5th Cir. (1954) (federal court applying O.C.G.A. § 10-1-470 to protect trademark of fraternal organization)). This Section states, in its entirety:

> No person or organization shall assume, use, adopt, become incorporated under, or continue to use the name and style or emblems of any benevolent, fraternal, social, humane, or charitable organization previously existing in this state, and which has been incorporated under the

laws of this or any other state or of the United States, or a name and style or emblem so nearly resembling the name and style of such incorporated organization as to be a colorable imitation thereof. In all cases where two or more of such societies, associations, or corporations claim the right to the same name or to names substantially similar as above provided, the organization which was first organized and used the name and first became incorporated under the laws of the United States or of any state, whether incorporated in this state or not, shall be entitled in this state to the prior and exclusive use of such name; and the rights of such societies, associations, or corporations and of their individual members shall be fixed and determined accordingly.

Community was created under Georgia law as a nonprofit corporation and its purpose is purely charitable. Therefore, it is entitled to protection of this Section. Furthermore, Defendants' Infringing Marks are "colorable imitations" of Community's Marks. (See *Faisan v. Adair*, 144 Ga. 797, 87 S.E. 1080 (1916) ("[t]he name of an order calling itself the "Ancient Egyptian Arabic Order, etc.,"

held a colorable misleading imitation of the name of a previously existing order calling itself the "Ancient Arabic Order, etc.," such as authorized the granting of a temporary injunction.") and *Emory v. Grand United Order of Odd Fellows*, 140 Ga. 423, 78 S.E. 922 (1913) ("Ancient Order of Odd Fellows, Leeds Unity," held a "colorable imitation" of the "District Grand Lodge, No.18, Grand United Order of Odd Fellows of America, Jurisdiction of Georgia"); see *Graves v. District Grand Lodge No. 18, Grand United Order of Odd Fellows of America*, 161 Ga. 110, 129 S.E. 783 (1925) ("[r]efusing to enjoin use by defendant of ritual, passwords, signs, and tokens of association held erroneous.")).

O.C.G.A. § 10-1-471 provides for injunctive relief for violations of § 10-1-470 and specifically states that "actual confusion" is not a prerequisite for injunctive relief. Because Defendants have infringed Community's marks, Community respectfully submits that an injunction should be imposed.

## III.   Scope of Injunctions Sought By Community

The injunctive relief requested by Community is reasonable and tailored. Community seeks to enjoin Defendants from using the Infringing Marks in Atlanta, New York City and Miami. This includes taking reasonable measures to deny users from those cities access to Defendants' website at

thecreatorsproject.com. Community also requests an order requiring Defendants destroy all items in their possession which contain the Infringing Marks.

In regard to the thecreatorsproject.com domain name, Community seeks an order requiring Defendants to relinquish all interest in it or any confusingly similar domain name and transfer all such domain names to Community.

Community also requests that Defendants be made to report its compliance with the injunction, as is typically required in connection with TROs and PIs.

## IV. <u>Request for Immediate Hearing and Rule 65(b) Certification</u>

Because of the ongoing irreparable harm to Community, it requests a hearing during the week of August 23. Pursuant to Rule 65(b) of the Federal Rules of Civil Procedure, the undersigned hereby certifies that he has provided counsel for Defendants with courtesy copies of the Complaint and this Motion, as follows:

Defendant Intel: Lindsey Mohle, Esq. at *lindsey.a.mohle@intel.com*

Caroline Selfridge, Esq. at *caroline.selfridge@intel.com*

Defendant Vice: Everett Ware at *everett@viceland.com*

Undersigned counsel will also forward to them notice of a hearing on this Motion, as soon as it is received such notice from the Court.

**V.**     **Conclusion**

Community respectfully requests both a Temporary Restraining Order and a Preliminary Injunction. Community will present a propose TRO to the Court at the hearing on this Motion or earlier, if directed to do so by the Court.

Respectfully submitted this 18th day of August, 2010.

**LILENFELD PC**

*s/David M. Lilenfeld*

David M. Lilenfeld
Georgia Bar No. 452399
R. Scott Griffin
Georgia Bar No. 140807
Attorney for Plaintiff
2964 Peachtree Road, NW, Suite 720
Atlanta, Georgia 30305
Phone: (404) 201-2520
Facsimile: (404) 393-9710
david@lilenfeldpc.com